

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

PETER NYGARD,

        *Defendant.*

Case No. 20 Cr. 624 (PGG)

UNDER SEAL

ORAL ARGUMENT REQUESTED

---

**MEMORANDUM OF LAW IN SUPPORT OF
NON-PARTY DGM FINANCIAL GROUP'S MOTION TO
<u>CLARIFY SCOPE OF RESTRAINING ORDER TO EXCLUDE UNTAINTED FUNDS</u>**

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .................................................................................. 4

II.  BACKGROUND ...................................................................................................... 7

   A.   DGM Financial Group ..................................................................................... 7

   B.   The Indictment ................................................................................................. 8

   C.   Edson's and Brause ......................................................................................... 9

   D.   The Marina del Rey Properties – Locations of Alleged Crimes .................... 10

   E.   The Gardena Warehouses – Uninvolved in Alleged Crimes .......................... 10

   F.   The Topanga and Saticoy Properties............................................................... 11

   G.   The Fiduciaries' Preemptive Efforts to Preserve Property Before
        the Restraining Order Was Even Issued .......................................................... 12

   H.   The Bill of Particulars ..................................................................................... 12

   I.   The Restraining Order ...................................................................................... 13

   J.   Discussions with the Government..................................................................... 14

III. AS A MATTER OF LAW, THE GOVERNMENT MAY ONLY FORFEIT
     PROPERTY BEARING A "SUBSTANTIAL CONNECTION" TO THE
     ALLEGED CRIMINAL CONDUCT. .................................................................... 15

   A.   The Government May Only Forfeit Property Used to Facilitate the Crimes. ............... 15

   B.   Facilitation Property Must Have a "Substantial Connection" to the
        Alleged Criminal Conduct............................................................................... 16

   C.   The Government Concedes There is No Substantial Connection Between
        the Alleged Criminal Conduct and the Gardena Warehouses. ........................ 18

IV.  EVEN IF ONE ACCEPTS THE GOVERNMENT'S UNPROVEN SUSPICIONS
     REGARDING A CONNECTION BETWEEN PETER NYGARD AND EDSON'S /
     BRAUSE, THE GARDENA WAREHOUSES ARE SUBSTITUTE ASSETS AND
     CANNOT BE FROZEN PRIOR TO CONVICTION.......................................... 19

V.   CONCLUSION ....................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529 (S.D.N.Y. 2011) ...................... 16, 17

*Luis v. United States*, 578 U.S. 5 (2016)................................................................................... 19

*United States v. Lam*, 2011 WL 1167208 (E.D. Va. Mar. 28, 2011)...................................... 17, 18

*United States v. Gotti*, 155 F.3d 144 (2d Cir. 1998) ................................................................ 19

*United States v. Hassan*, 439 F. Supp. 2d 903 (E.D. Ark. 2006)............................................ 17

*United States v. Kenner*, 443 F. Supp. 3d 354 (E.D.N.Y. 2020) ............................................ 17

*United States v. King*, 231 F. Supp. 3d 872 (W.D. Okla. 2017)............................................ 17, 18

*United States v. Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y. 2009) ............................................ 17

*United States v. Reid*, 732 F. App'x 14 (2d Cir. 2018)............................................................ 16

*United States v. Sabhnani*, 566 F. Supp. 2d 148 (E.D.N.Y. 2008) ................................................ 16

*United States v. Two Tracts of Real Prop. With Bldgs., Appurtenances &*
  *Improvements Thereto, Located in Carteret Cty., N.C.*, 998 F.2d 204 (4th Cir. 1993).... 19

*United States v. Wyly*, 193 F.3d 289 (5th Cir. 1999) .................................................................. 16


**<u>Statutes</u>**

18 U.S.C. § 1594................................................................................................................ 13, 16

21 U.S.C. § 881.................................................................................................................. 16


**<u>Treaties</u>**

Treaty on Extradition Between the Government of Canada
  and the Government of the United States, Dec. 3, 1971, 27 U.S.T. 983 ............................ 8

## I.    PRELIMINARY STATEMENT

DGM Financial Group, as trustee of the Elsinore Trust ("DGM"), submits this memorandum in support of its motion to clarify the scope of the Restraining Order issued by this Court on May 26, 2021.  Certain commercial property belonging to the Elsinore Trust has been effectively frozen because the Government claims there is a judicial restraint over such property pursuant to this Court's Restraining Order.  Based on our review of the applicable law and the Restraining Order, however, we do not believe the Court intended to restrain the commercial property at issue.  DGM seeks clarification that while the Restraining Order restrains specific, residential real property (listed in the Order itself) allegedly used to commit the charged crimes, it does not restrain commercial assets that are not listed in the Order and are not even alleged to be connected to the charged crimes.  At issue are proceeds from the sale of industrial clothing distribution warehouses not alleged by the Government to be connected to the charged sex trafficking (the proceeds of which are currently held by Edson's Investments, Inc. ("Edson's") and Brause Investments, Inc. ("Brause"), both of which are owned by the Elsinore Trust).  This motion presents an issue of law based on undisputed facts.

*United States v. Peter Nygard* is not a criminal proceeds case.  The only legal theory of forfeiture the Government is pursuing is <u>facilitation</u>—that is, certain property was used to help commit the charged sex offenses.  Although the Government can restrain and forfeit property substantially connected to the charged offenses (like residential apartments where sex trafficking allegedly took place), it cannot restrain and forfeit untainted property (like commercial warehouses which stored clothes) simply because they were owned by the same legal entities that owned the apartments.  This legal principle is black letter law.

DGM does *not* contest that the Restraining Order applies to the Marina del Rey, California

properties listed in the Restraining Order, because the Government alleges that much of the criminal activity took place at those residential locations. In fact, *before the Order was known*, DGM as trustee and other fiduciaries of Edson's and Brause had already taken steps to freeze and preserve that residential property for future disposition as this Court deems appropriate.

DGM submits, however, that the Court must not have intended for the Restraining Order to apply to other commercial assets of Edson's and Brause that are unrelated to allegations of sex trafficking, including the proceeds from the sale of clothing distribution warehouses. Indeed, the plain language of the Restraining Order only restrains property "subject to forfeiture" and states that all of the listed assets "are alleged to constitute property *used to commit*" the sex trafficking violations. *See* Declaration of Alexandria E. Swette, dated October 1, 2021 ("Swette Decl."), Ex. A (Order) at 2 (emphasis added). Nevertheless, the Government has cited to general language elsewhere in the Restraining Order, such as a reference to "[a]ny and all" property of Edson's and Brause, and asserted that the Court intended to freeze all assets of Edson's and Brause, including even untainted assets (even though the Restraining Order's reference to the same is modified by the limitation "subject to forfeiture").

Unfortunately, even after substantial communications between DGM's counsel and the Government, the Government continues to insist (contrary to law, as explained below) that the Restraining Order restrains even untainted property because it was commonly owned by legal entities that also owned tainted facilitating property. In hearing this unusual legal theory, counsel for DGM asked the Government whether, in its *ex parte* application for the Order, the Government had provided the Court with an accurate and complete description of the legal standards for restraining property pre-trial, such as the principle that only facilitating property with a substantial connection to the crime can be forfeited (and therefore restrained pre-trial). The

Government has declined to detail what representations it made to the Court in the *ex parte* application.

The Government's position with respect to the Restraining Order puts DGM, as a fiduciary of the Elsinore Trust and its assets, in urgent difficulty. Because the Government has asserted that the Court intended to freeze all assets of Edson's and Brause, and threatened criminal contempt for any transactions even in untainted assets, it has effectively paralyzed DGM from dealing with the necessary affairs of property under its trusteeship—namely, the assets of Edson's and Brause. Without access to resources to maintain the properties and to take legal advice to guide its future actions in this complex situation, DGM is seriously hampered from discharging its own fiduciary duties to protect and preserve the value of the assets under its care. At this point, DGM desperately needs the necessary guidance from judicial authorities: (1) in the first instance from this Court as to whether the Restraining Order actually restrains even untainted assets of Edson's and Brause based on a theory of common ownership, and (2) if this Court responds in the affirmative, then from a court in Barbados for guidance on how DGM can discharge its fiduciary duties under applicable law where it is prohibited from dealing with any of the assets under its care or even taking legal advice on the topic.

If indeed this Court clarifies that even the untainted assets of Edson's and Brause are restrained, this will mean that DGM cannot access the resources necessary to maintain such assets and access legal representation to defend those assets. In such circumstances, DGM might be forced to surrender its decision-making authority to the Barbados courts and/or to resign its trustee position, to protect itself from potential liabilities incurred from holding an ongoing trusteeship in which it is paralyzed from performing its duties.[1] If DGM is forced to resign and hand over

---

[1] Because it has fiduciary duties to the Trust both under the Trust's governing documents and under Barbados statute, under the laws of Barbados, DGM would need to take such steps to relieve

the administration to the Barbados court, this "failed trust" situation will invite adverse claims in Barbados for adjudication of various persons' rights to the property under the Trust. This could include, for example, a claim by Peter Nygard as settlor of the Elsinore Trust, seeking to reclaim the assets (both tainted and untainted) from a malfunctioning trust. It could also include claims by various persons purporting to be victims of Nygard's crimes, as well as claims by beneficiaries of the Trust, for judicial determinations as to who should receive what property formerly under the Trust. In effect, there would arise a parallel set of legal proceedings in the Barbados to adjudicate some of the same claims that would in the ordinary course be decided by this Court as part of the criminal forfeiture proceedings. This is an outcome that DGM believes would be unfortunate and inappropriate but has become a real risk if DGM is left in the present state of paralysis with respect to the Trust assets.

Accordingly, per the procedures set forth in the Restraining Order, DGM now appeals the Government's interpretation of the Restraining Order to the Court and seeks judicial clarification that, consistent with black letter law and undisputed facts, the Restraining Order applies only to assets alleged to have been used to commit the alleged offenses.

## II.     BACKGROUND

### A.  DGM Financial Group

DGM is a professional trust and corporate services firm based in Wildey, Barbados. It has been providing independent trustee services for over 20 years. It is a listing sponsor on the Barbados Stock Exchange. DGM has been the trustee of the Elsinore Trust since June 2017, when the trust was settled. The Elsinore Trust was settled by Peter Nygard and is irrevocable.

---

it of continued responsibility for the ongoing administration of the Trust, to mitigate its own potential liabilities, and/or to confer appropriate protection on DGM.

Peter Nygard is not a beneficiary of the Elsinore Trust. The Elsinore Trust is the ultimate owner of various corporate entities, including Edson's and Brause. As trustee, DGM has a fiduciary duty to the Elsinore Trust and its assets.

### B. The Indictment

The Indictment, unsealed on December 15, 2020 (ECF No. 2), charges Nygard with various sex-trafficking and RICO offenses. Citing general statutory language about forfeiture, the Indictment does not specify any particular property subject to forfeiture. The Government initiated extradition proceedings against Nygard. As part of the extradition process, to overcome certain potential defenses to extradition by Nygard, it appears that the Government undertook to the Canadian courts that, after extradition, it would not prosecute Peter Nygard under RICO, but rather would proceed only under the sex-trafficking offenses. *See* Judicial Interim Release Order ¶ 7, R. v. Nygard, 2021 MBQB 27 (Can. Feb. 5, 2021), ("I note that much of the information provided in the USA's letters appears to relate to the racketeering charge. However, counsel for the AG advised that he was not relying on that charge in opposing bail."). After extradition, the rule of specialty prohibits adding criminal charges beyond the scope of the extradition order. *See* Treaty on Extradition Between the Government of Canada and the Government of the United States art. 12, Dec. 3, 1971, 27 U.S.T. 983.

This narrowing of the Indictment is significant. As noted below, the Government is now only proceeding under forfeiture theories linked to the sex trafficking offenses, which require a substantial connection between the offense and each specific piece of property to be restrained. The Government is not proceeding under the more expansive forfeiture theory under RICO, in which property belonging to alleged corrupt "enterprise" that committed RICO offenses can sometimes be forfeited even if not substantially connected to the offense. Indeed, when the

Government issued its Bill of Particulars in this Court listing the property it intended to forfeit, the Government noted that it was proceeding only on Counts Two through Five of the Indictment, excluding the RICO conspiracy in Count One. (ECF No. 6.)

## C. Edson's and Brause

Edson's and Brause were part of the Nygard fashion business, which was founded in 1967 and employed over 2,000 people. Until the brand collapsed, it operated for decades in the fashion business. Its thousands of employees worked together in the design, manufacture, marketing, distribution, storage (including in the Gardena warehouses, which served only as distribution centers for clothing), and retail sales of women's clothing. The Nygard fashion brands were award-winning and widely recognized. The clothing was sold in household-name stores like Dillard's, Walmart, Costco, Belk, Sears, and The Bay. The business was a pioneer in e-commerce and integrating technology into clothing distribution and retail. The Nygard brand generated annual gross revenues of over US $225 million throughout Canada and the United States. There is no dispute that all of the Nygard brand's business revenues and assets were generated by legitimate business activities—the sale of women's apparel and accessories—and that none of the business's revenue or assets, including those of Edson's and Brause, were derived from any of the illegal sex offenses alleged against Nygard.

Edson's and Brause's current assets primarily consist of the following:

- Real property in Marina del Rey, California: Units A and B at 1 Yawl Street and 5409 Ocean Front Walk;

- Proceeds of the sale of 17.5 Yawl Street in Marina del Rey, California: approximately US $1.9 million (which had been proactively preserved by DGM and other fiduciaries even before the Restraining Order);

- Proceeds of the sale of commercial warehouses located in Gardena, California (referred to herein as the "Gardena Warehouses"); and

- Accounts receivable of various sums of money from various debtors.

Both Edson's and Brause employ an in-house lawyer and have ongoing expenses relating to property maintenance, insurance, taxes, upkeep, bookkeeping, employing outside legal counsel to advise on responding to grand jury subpoenas recently issued by the Government to both, and indemnifying the legal expenses of indemnified officers and directors. DGM seeks access to the untainted assets of Edson's and Brause (e.g., the proceeds of the Gardena Warehouses) to secure ongoing legal representation and to guide DGM's future actions as to the assets under its care.

To be clear, the descriptions about DGM's difficult situation is provided to assist the Court in understanding the context in which this application arises. This application is to clarify that the Court did not intend to restrain such untainted assets. It is not an application to access tainted or restrained funds on the basis of need and DGM is not asking for this Court to review proposed expenditures on an itemized basis.

### D. The Marina del Rey Properties – Locations of Alleged Crimes

The restrained property in Marina del Rey—consisting of 1 Yawl St., 17.5 Yawl St., and 5409 Ocean Front Walk (together the "Marina del Rey Properties")—is residential. According to the Government's allegations, Nygard used this property to commit the charged sex-trafficking offenses. The Indictment alleges that Nygard used the Marina del Rey Properties to host parties which were part of the sex-trafficking offenses. *See, e.g.*, Indictment ¶¶ 13, 17(a) and (c); Swette Decl., Ex. B (Letter from AUSA Kelly to Jean Aylward, Office of International Affairs, dated January 6, 2021) at 1-2 (noting that Marina del Rey is "where much of the offense conduct occurred").

DGM is not contesting that the Restraining Order applies to this property.

### E. The Gardena Warehouses – Uninvolved in Alleged Crimes

Edson's previously owned clothing distribution warehouses at 14702 South Maple Ave.,

14401 S. San Pedro St., and 14421 S. San Pedro St., while Brause owned warehouses at 312 E Rosecrans Ave. and 332 E Rosecrans Ave., all of which are located in Gardena, California (together, the "Gardena Warehouses"). The Nygard fashion business—formerly composed of thousands of employees selling clothing across the United States, Canada, and other markets— used these warehouses solely for commercial purposes and not for criminal purposes.[2] The Government does not dispute this. The Gardena Warehouses' *only* connection to forfeitable property (the Marina del Rey Properties) is that they were owned by the same entities (Edson's and Brause) that own the Marina del Rey Properties. After the Nygard brand collapsed following the first revelation of the allegations now charged in the Indictment, Edson's and Brause sold the no-longer needed Gardena Warehouses on July 29 and October 29, 2020. Proceeds of those sales comprise most of the remaining liquid assets held by Edson's and Brause.[3]

### F.  The Topanga and Saticoy Properties

The Restraining Order also lists property in Chatsworth, California (9450 Topanga Canyon Blvd.) and Los Angeles (13700-04 Saticoy St.). The Elsinore Trust has not owned these properties since 2019. Like the Gardena Warehouses, the Government does not allege that the

---

[2] The warehouses were used to store and sort clothes for shipment to U.S. retailers. *See, e.g.*, Richter Advisory Group Inc., Third Report of the Receiver ¶¶ 26–30 (June 22, 2020), *available at* https://www.richter.ca/wp-content/uploads/2020/03/48-third-report-of-the-receiver-final5580736-1.pdf (discussing detailed steps to coordinate repossession of clothing held by Nygard Inc. at one of the Gardena warehouses); Richter Advisory Group Inc., Ninth Report of the Receiver ¶ 45 (Nov. 2, 2020), *available at* https://www.richter.ca/wp-content/uploads/2020/03/74-ninth-report-of-the-receiver-dated-november-2-20205985040-1.pdf ("The California Properties were leased to Nygard Inc., one of the Debtors, and were used primarily as a distribution centre and warehouse for inventory . . . purchased primarily for the fulfillment of sales to various third-party wholesale customer in the United States."). One of the warehouses (14702 South Maple Street) was rented out to a third party with no connection to the Nygard business at all.

[3] Beyond an amount equal to the proceeds of the sale of 17.5 Yawl Street, approximately US $1.9 million, which is being and will continue to be preserved.

Topanga and Saticoy properties were used to commit the sex trafficking offenses. However, since these properties are now outside of the Elsinore Trust, DGM takes no position on whether these properties are covered by the Restraining Order.

### G. The Fiduciaries' Preemptive Efforts to Preserve Property Before the Restraining Order Was Even Issued

Even prior to learning of the Restraining Order, the fiduciaries of Edson's and Brause took affirmative steps to preserve property connected to the alleged sex trafficking. After the Indictment was unsealed, the fiduciaries including DGM (having taken legal advice from the undersigned) moved swiftly to preserve (for eventual decision by this Court) the full value of any property or assets substantially connected to the alleged criminal conduct, including the Marina del Rey Properties.

On March 15, 2021, Brause sold the property at 17.5 Yawl Street, a property that would eventually be listed in the Restraining Order, for US $1.9 million, and took steps (even before the Restraining Order was known) to preserve that amount in its accounts in the event of possible future forfeiture. Indeed, DGM does not contest the applicability of the Restraining Order to those assets. Likewise, if the properties at 1 Yawl Street and 5409 Ocean Front Walk are sold (with prior permission of the Government or Court), Brause intends to preserve those proceeds in a similar manner.

### H. The Bill of Particulars

On May 26, 2021, the Government filed its Forfeiture Bill of Particulars. (ECF No. 6.) The Bill of Particulars specifies the property which the Government intends to forfeit, listing: (i) the Marina del Rey Properties; (ii) the real property at 9450 Topanga Canyon Blvd., Chatsworth, California; and (iii) the real property at 13700-13704 Saticoy Street, Los Angeles, California. The Bill of Particulars did not apply to Count One of the Indictment (RICO); it only noticed

forfeiture on the sex trafficking counts.  The Gardena Warehouses are not mentioned.

### I.  The Restraining Order

That same day, May 26, 2021, the Court issued the Restraining Order covering the property listed in the Bill of Particulars.  The Gardena Warehouses are not mentioned in the Restraining Order.

The Restraining Order was based on the Government's *ex parte* application and, like the Bill of Particulars, was predicated solely on sex-trafficking forfeiture pursuant to 18 U.S.C. § 1594.  The Restraining Order is not premised on RICO forfeiture laws at all.

The Restraining Order restrains "all persons or entities having actual knowledge of this Order" from the ability to "transfer, sell, assign, pledge, hypothecate, encumber, or dispose in any manner" property that is "subject to forfeiture."  Swette Decl., Ex. A (Order), at 1–2.  It lists:

(a)    Any and all property of Edson's Investments Inc., including, without limitation:

    (i)    The real property located at 9450 Topanga Canyon Boulevard, Chatsworth, California;

    (ii)    The real property located at 5409 Ocean Front Walk, Marina del Rey, California; and

    (iii)    The real property located at 13700-13704 Saticoy Street, Los Angeles, California; and

(b)    Any and all property of Brause Investments, Inc., including without limitation:

    (i)    The real property located at 1 Yawl Street, Marina del Rey, California; and

    (ii)    The real property located at 17½ Yawl Street, Marina del Rey, California; all of which are alleged to constitute property used to commit violations of (i) Title 18, United States Code, Section 1591 (sex trafficking by a minor and by force, fraud, and coercion; and sex trafficking by force, fraud, and coercion); and (ii) Title 18, United States Code, Section 1594 (sex trafficking conspiracy).

*Id.* at 2.

The Restraining Order contains a mechanism through which the Government is to review

any request for clarification of applicability of the order and consider granting written approval for transactions to "any person or entity claiming an interest in the assets listed." *Id.* at 2–3. The Court ordered that anyone receiving the written approval of the Government "will not be deemed in violation of this Order." *Id.* at 3.

### J. Discussions with the Government

The Gardena Warehouses were not mentioned in the Restraining Order, nor were they the subject of Government allegations of involvement in the charged sex trafficking offenses. Nevertheless, to avoid any later misunderstandings that DGM transacted in property that this Court had restrained, DGM, in an abundance of caution, asked the Government to confirm that this Court had not restrained proceeds of the Gardena Warehouses.

In response, the Government has claimed that this Court intended to restrain the Gardena Warehouses as well. The Government's posture is grounded on a conclusory legal position that the Court must have intended to restrain all property (even untainted property) of corporate entities Edson's and Brause for possible eventual forfeiture, because of the inclusion of the phrase "any and all property [of Edson's] / [of Brause]." Swette Decl., Ex. A (Order), at 2.

DGM believes that the Government likely did not present any evidence to this Court regarding the Gardena Warehouses facilitating Nygard's sex-trafficking crimes (because none could exist) in its *ex parte* application and thus that the Court could not have intended to restrain such untainted assets.[4]

---

[4] The Government has also argued to us, in the alternative, that in their view, Edson's and Brause *themselves* were facilitating property (i.e., that the companies themselves assisted Nygard in committing offenses and thus facilitated the crimes) and therefore everything they own (even property unconnected to the offense) should also be forfeitable. This might well be the Government's view, but the U.S. Attorney's Office is part of the executive branch with no judicial authority. It cannot conjure up, based on its own views of what is fair, new provisions of the Restraining Order that this Court did not write. The Government's view appears to be a confused nostalgia for the law of RICO forfeiture, under which even untainted property of criminal

Despite the Government's unusual legal positions, as noted below it remains black letter law that the Court can restrain pre-trial only facilitating property which were used to commit the offenses, which the Gardena Warehouses were not.

In the course of these discussions, DGM requested that the Government permit Edson's and Brause to make certain necessary payments to various parties, such as an overdue bill of $1,152 for a housekeeper at one of the properties (a woman who worked over 60 hours, still without pay), as well as utility and sanitation bills. While the Government, after many weeks of ignoring these requests, stated it would permit these payments, it conditioned such approval on Edson's, Brause, and DGM executing a stipulation that would effectively prevent these parties from petitioning the Court with respect to the Government's incorrect and overbroad interpretation of the Restraining Order.

### III.    AS A MATTER OF LAW, THE GOVERNMENT MAY ONLY FORFEIT PROPERTY BEARING A "SUBSTANTIAL CONNECTION" TO THE ALLEGED CRIMINAL CONDUCT.

#### A.    The Government May Only Forfeit Property Used to Facilitate the Crimes.

Under Section 1594(e), property can be forfeited on one of two grounds: (i) if the property was "involved in, used, or intended to be used to commit or to facilitate" the criminal conduct; or

---

enterprises can be forfeitable. However, as part of its strategy in overcoming Peter Nygard's extradition defenses, the Government has abandoned RICO theories and grounded the Bill of Particulars on non-RICO sex trafficking charges alone. *See* Judicial Interim Release Order ¶ 7, R. v. Nygard, 2021 MBQB 27 (Can. Feb. 5, 2021); ECF No. 6 (excluding Count One RICO charges); Order (not predicated on Count One RICO charges). Indeed, this Court's Restraining Order similarly notes only Counts Two to Five of the Indictment as its basis. Swette Decl., Ex. A (Order), at 2. Indeed, the plain language of the Restraining Order states that all of the listed assets "are alleged to constitute property *used to commit*" the sex trafficking violations. *Id.*

Non-RICO facilitation forfeiture is limited to actual property substantially connected to an offense. Consistent with this principle of facilitation forfeiture, the Restraining Order specifies as facilitating property only certain residential real properties at which Nygard is alleged to have committed the offenses at issue.

(ii) if the property constitutes "proceeds traceable to" the criminal conduct.   18 U.S.C. § 1594(e)(1)(A-B). Here, the Government's forfeiture theory is based only on "facilitation."  The Government has charged Nygard with engaging in a sex-trafficking operation.  Unlike some sex-trafficking cases, which are carried out to generate illicit profits, this one is not alleged to have produced any proceeds. The charged scheme generated no profits. Rather, the Government alleges Nygard engaged in sex-trafficking for one purpose—to serve his own personal desires.   This distinction is critical: if Edson's and Brause currently held *proceeds* of a sex-trafficking ring, then of course those proceeds could be frozen.   That is not, however, what the Restraining Order restrains.  Rather, it is directed at property used to commit the charged crimes.

### B.    Facilitation Property Must Have a "Substantial Connection" to the Alleged Criminal Conduct.

Under the facilitation theory of forfeiture, the scope of forfeitable property is any property bearing a "*substantial connection*" to the alleged offense, or which "makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 564 (S.D.N.Y. 2011); *see also United States v. Reid*, 732 F. App'x 14, 18 (2d Cir. 2018) (stating, in the context of forfeiture under 21 U.S.C. § 881, that property is subject to forfeiture "only if [it has] some substantial connection to, or [is] instrumental in, the commission of the underlying criminal activity which the statute seeks to prevent" (citation omitted)); *United States v. Sabhnani*, 566 F. Supp. 2d 148, 152 (E.D.N.Y. 2008) (finding, with respect to forfeiture under 18 U.S.C. § 1594, "[f]acilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance" (quoting *United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999))), *aff'd*, 599 F.3d 215 (2d Cir. 2010).

On that basis, courts in this and other Circuits routinely have denied requests by the Government to forfeit property that had only a tenuous or incidental connection to the criminal

conduct, such as ownership by a person or company that is alleged to have also participated in the crimes. *See, e.g., United States v. Kenner*, 443 F. Supp. 3d 354, 375 (E.D.N.Y. 2020) (refusing to forfeit certain properties on the grounds that there was no evidence that the investments in those properties "were the product of fraud by either defendant, or that they were used to facilitate or conceal the money-laundering conspiracy"); *United States v. Nicolo*, 597 F. Supp. 2d 342, 357 (W.D.N.Y. 2009) (finding that defendant's acts performed at real property owned by his wife, such as faxing invoices, and his use of properties as a mailing address for his business were merely "incidental or fortuitous" and did not create a sufficient nexus between the properties and the offense to allow facilitation forfeiture); *United States v. Lam*, 2011 WL 1167208, at *8 (E.D. Va. Mar. 28, 2011) ("The Government has not met the burden of showing a substantial connection between the New Jersey warehouse and Defendants' criminal activity."); *United States v. Hassan*, 439 F. Supp. 2d 903, 906–08 (E.D. Ark. 2006) (finding "the fact that the [convenience] store was used to generate money, some of which was sent overseas in transactions allegedly structured to avoid reporting, is insufficient to establish that the store facilitated the structuring").

In addition, the requisite nexus must exist between the alleged offense and *each* of the restrained assets. *See, e.g., In re 650 Fifth Ave.*, 777 F. Supp. 2d at 564 ("The Court now considers whether *each of the properties* the government seeks to forfeit . . . facilitated those money laundering transactions . . . ." (emphasis added)); *United States v. King*, 231 F. Supp. 2d 872, 1009–12 (W.D. Okla. 2017) (analyzing the forfeitability of specific assets, including the defendant's house, investment accounts, car, and money separately). Such connection is missing here between the offenses and the untainted property of Edson's and Brause, such as the Gardena Warehouses.

**C.    The Government Concedes There is No Substantial Connection Between the Alleged Criminal Conduct and the Gardena Warehouses.**

The Government has not alleged any substantial connection between the Gardena Warehouses and alleged criminal conduct. Indeed, the Government's public statements about the Gardena Warehouses reflect that their only connection to the alleged criminal conduct was their ownership by Edson's and Brause.

That the Government alleges that Edson's and Brause were controlled by Peter Nygard does not change this analysis.[5] The only issue relevant to a pre-trial restraint of property is whether the specific property is forfeitable as facilitating property, not whether it was or is owned or controlled by the defendant. The Government has not alleged—indeed, it cannot allege because it would be untrue—that any of the sex trafficking occurred at any of the Gardena Warehouses.

Courts have determined that such a connection—mere ownership by persons or companies alleged to have participated in the crime—to be insufficient to justify forfeiture of the asset as facilitation property. For example, in *United States v. Lam*, the court denied forfeiture of a warehouse that the government alleged was used to store counterfeit products, finding that the government had failed to establish evidence showing that the warehouse had actually been used for that purpose. 2011 WL 1167208, at *7; *see also, e.g., King*, 231 F. Supp. 3d at 1009–10 (denying forfeiture of house in which illegal bookmaking occurred because there was insufficient

---

[5] *See* Swette Decl., Ex. C (Letter from AUSA Kelly to Jean Aylward, Office of International Affairs, dated January 5, 2021) at 3 ("[P]ublic records indicate that *a warehouse owned by one of the corporate entities within the Nygard Group* controlled by Nygard was sold in or about August of 2020 for more than $30 million USD." (emphasis added)); Swette Decl., Ex. B (Letter from AUSA Kelly to Jean Aylward, Office of International Affairs, dated January 6, 2021) at 1–2 ("Edson's and Brause are notable entities in the criminal case because *they also held ownership interest* in Nygard's residential property in Marina del Rey, California, where much of the offense conduct occurred. . . . Company emails also *demonstrate that Nygard personally controlled the various entities* in the Nygard Group whether or not he was formally the managing executive." (emphasis added)).

evidence that the defendant's use of his house facilitated the illegal conduct, even though facilitating items were found in the house); *United States v. Two Tracts of Real Prop. With Bldgs., Appurtenances & Improvements Thereto, Located in Carteret Cty., N.C.*, 998 F.2d 204 (4th Cir. 1993) (finding use of a large parcel of property merely as a shortcut for transporting contraband from a property outside the parcel to another property outside the parcel generally would have only a fortuitous connection to the criminal activity).

## IV.   EVEN IF ONE ACCEPTS THE GOVERNMENT'S UNPROVEN SUSPICIONS REGARDING A CONNECTION BETWEEN PETER NYGARD AND EDSON'S / BRAUSE, THE GARDENA WAREHOUSES ARE SUBSTITUTE ASSETS AND CANNOT BE FROZEN PRIOR TO CONVICTION.

To justify its position that all assets (even untainted) of Edson's and Brause being restrained is "fair", the Government has argued that it believes Edson's and Brause might be secretly controlled by Peter Nygard today (and thus presumably forfeitable upon his conviction as substitute assets). DGM believes that this suspicion is misguided. DGM believes that there was no factual record presented to this Court in the Government's *ex parte* application for the Restraining Order to support such a sweeping accusation.

Regardless, this is a factual issue that this Court need not address at this stage. Even assuming hypothetically that Peter Nygard secretly controls the assets of Edson's and Brause, that is not a lawful basis to restrain those assets *prior to* conviction pursuant to the forfeiture laws. It is black letter law that substitute assets—unlike assets that are directly traceable as facilitation property—are not subject to a pre-conviction restraint. *Luis v. United States*, 578 U.S. 5 (2016) (holding that substitute assets cannot be frozen at pretrial stage; if the court determines that there is no probable cause to believe the property is directly forfeitable, it must exempt funds needed for reasonable attorney's fees); *United States v. Gotti*, 155 F.3d 144 (2d Cir. 1998) (holding that the pretrial restraint of substitute assets is impermissible). Thus, to the extent that the Gardena

Warehouses are not facilitating property, the pre-conviction restraint on these assets must be lifted regardless of the correctness of the Government's suspicion that Peter Nygard secretly owns or controls Edson's and Brause.

## V.    **CONCLUSION**

For the reasons stated above, DGM respectfully requests that the Court clarify the scope of the Restraining Order to confirm that, on the factual record submitted with the *ex parte* application, it applies only to the specific properties listed in the Order, and not to other assets of Edson's and Brause.

Respectfully submitted,

Dated:  New York, NY                    KOBRE & KIM LLP
        October 15, 2021

                                       _____
                                       Alexandria E. Swette
                                       Michael S. Kim
                                       Sean Buckley
                                       Jason A. Masimore
                                       Evelyn B. Sheehan
                                       *(pro hac vice application forthcoming)*
                                       Jeremy O. Bressman
                                       Alexandria E. Swette

                                       800 Third Avenue
                                       New York, New York 10022

                                       +1 212-488-1200 (Telephone)
                                       +1 212-488-1220 (Fax)
                                       alexandria.swette@kobrekim.com
                                       michael.kim@kobrekim.com
                                       sean.buckley@kobrekim.com
                                       jason.masimore@kobrekim.com
                                       evelyn.sheehan@kobrekim.com
                                       jeremy.bressman@kobrekim.com

                                       *Attorneys for DGM Financial Group,*
                                       *as Trustee of the Elsinore Trust*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

PETER NYGARD,

*Defendant.*

Case No. 20 Cr. 624 (PGG)

UNDER SEAL

ORAL ARGUMENT REQUESTED

## DECLARATION OF ALEXANDRIA E. SWETTE
### IN SUPPORT OF NON-PARTY DGM FINANCIAL GROUP'S MOTION TO
### CLARIFY SCOPE OF RESTRAINING ORDER TO EXCLUDE UNTAINTED FUNDS

I, Alexandria E. Swette, hereby declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, the following:

     1.    I am an attorney at the law firm of Kobre & Kim LLP, counsel for DGM Financial
Group, as trustee of the Elsinore Trust. I am a member of the New York bar and duly admitted to
practice in this court.

     2.    I submit this declaration is support of the Memorandum of Law in Support of Non-
Party DGM Financial Group's Motion to Clarify Scope of Restraining Order to Exclude Untainted
Funds.

     3.    Attached hereto as **Exhibit A** is a true and correct copy of the Restraining Order
issued by this Court on May 26, 2021.

     4.    Attached hereto as **Exhibit B** is a true and correct copy of a letter from AUSA
Jacqueline Kelly to Jean Aylward, Office of International Affairs, dated January 6, 2021.

5.     Attached hereto as **Exhibit C** is a true and correct copy of a letter from AUSA Jacqueline Kelly to Jean Aylward, Office of International Affairs, dated January 5, 2021.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, NY
         October 15, 2021

_____
Alexandria E. Swette

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    **TO BE FILED UNDER SEAL**

   -v.-    :    POST-INDICTMENT
                                RESTRAINING ORDER
PETER NYGARD,    :
                Defendant.    :    20 Cr. 624 (PGG)

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      Upon the application of AUDREY STRAUSS, United States Attorney for the

Southern District of New York, pursuant to Title 18, United States Code, Section 1594, the

Declaration of Special Agent Rachel Graves of the Federal Bureau of Investigation, and the

Declaration of Assistant United States Attorney Jacqueline C. Kelly, executed on April 29, 2021,

and all papers submitted in support thereof,

      **IT IS HEREBY ORDERED** that PETER NYGARD, the Defendant, and all

attorneys, agents, and employees, and anyone acting on the behalf of him, and all persons or

entities in active concert or participation with any of the above, and all persons or entities having

actual knowledge of this Order, shall not take any action prohibited by this Order.

      **IT IS FURTHER ORDERED** that PETER NYGARD, the Defendant, and all

attorneys, agents, and employees, and anyone acting on the behalf of him, and all persons or

entities in active concert or participation with any of the above, and all persons or entities having

actual knowledge of this Order, shall not, directly or indirectly, transfer, sell, assign, pledge,

hypothecate, encumber, or dispose of in any manner; cause to be transferred, sold, assigned,

pledged, hypothecated, encumbered, disposed of in any manner; or take, or cause to be taken, any

action that would have the effect of depreciating, damaging, or in any way diminishing the value of property or other interests belonging to, or owed to, or controlled in whole or in part by the Defendant, which property or other interests are subject to forfeiture. The property and other interests hereby restrained include, but are not limited to, the following:

    a.    Any and all property of Edson's Investments Inc., including, without limitation:

        i.    The real property located at 9450 Topanga Canyon Boulevard, Chatsworth, California;

        ii.    The real property located at 5409 Ocean Front Walk, Marina del Rey, California; and

        iii.    The real property located at 13700-13704 Saticoy Street, Los Angeles, California;

    b.    Any and all property of Brause Investments, Inc., including without limitation:

        i.    The real property located at 1 Yawl Street, Marina del Rey, California; and

        ii.    The real property located at 17 ½ Yawl Street, Marina del Rey, California;

all of which are alleged to constitute property used to commit violations of (i) Title 18, United States Code, Section 1591 (sex trafficking by a minor and by force, fraud and coercion; and sex trafficking by force, fraud and coercion); and (ii) Title 18, United States Code, Section 1594 (sex trafficking conspiracy);

        **IT IS FURTHER ORDERED** that the United States Attorney's Office for the Southern District of New York, in its discretion, is authorized to direct the release of assets restrained herein;

        **IT IS FURTHER ORDERED** any person or entity claiming an interest in the assets listed in this Order may contact the following Assistant United States Attorney to clarify the

scope of the Order:  Assistant United States Attorney Jacqueline C. Kelly, Telephone Number (212) 637-2456.  Those persons or entities will not be deemed in violation of this Order for any transactions undertaken upon approval made in writing by Assistant United States Attorney Kelly.

**IT IS FURTHER ORDERED** that this Restraining Order shall be binding upon the Defendant, the attorneys, agents, and employees, and all persons in active concert or participation with any of the above, or any other person having actual knowledge of this Order, and that this Order shall remain in effect until further order of this Court;

**IT IS FURTHER ORDERED** that this Restraining Order and all papers submitted therewith shall be maintained under seal until such time as the unsealing of the above-captioned criminal Indictment, except that the United States Attorney's Office or its designee(s) may provide copies of (1) this Order to any person in order to facilitate the execution of this Restraining Order, including any relevant foreign law enforcement agency, financial institutions, and/or the Defendant; and (2) the application of Jacqueline C. Kelly, Assistant United States Attorney, pursuant to Title 18, United States Code, Section 1594, and the Declaration of Special Agent Rachel Graves, Federal Bureau of Investigation, to any foreign law enforcement agency to the extent necessary to enable such agency to assist in the execution of the seizure sought herein; and

**IT IS FURTHER ORDERED** that service of a copy of this Order shall be made on the Defendant or his attorney by regular mail.

Dated: New York, New York
      May 26, 2021

*Pauls Gardephe*

_____
THE HONORABLE PAUL G. GARDEPHE
United States District Judge
Southern District of New York

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 6, 2021

<u>BY EMAIL</u>

Jean Aylward
Office of Internal Affairs
United States Department of Justice
Criminal Division
1301 New York Avenue, N.W.
Washington, D.C. 20530

  **RE:** *United States v. Peter Nygard*, **20 Cr. 624 (S.D.N.Y.)**

Dear Ms. Aylward:

  We write to supplement our letter dated January 5, 2021, providing additional information regarding Peter Nygard, the defendant in the above-referenced case. Nygard was provisionally arrested on December 14, 2020. The full extradition package will be submitted to Canada by February 12, 2021.

  During the past several months, certain United States-based entities controlled by Nygard have sold a number of real estate holdings in California, totaling nearly $70 million U.S. dollars. On or about July 29, 2020, a Nygard entity named "14702 South Maple Street LLC" sold a warehouse location at that same address in Gardena, California for $30,700,500 cash to Centerpoint Properties Trust. Nygard's niece and longtime employee of the Nygard Group, Angela Dyborn, is listed as a member-manager of 14702 South Maple Street LLC in California Secretary of State records. Edson's Investments Inc., ("Edson's") an American Nygard Group entity controlled by Nygard, is also listed as a member-manager of the entity in California Secretary of State records. On or about October 26, 2020, Edson's and Brause Investments Inc. ("Brause"), another American Nygard Group entity controlled by Nygard, sold four additional properties in Gardena, Califoria to Centerpoint Properties Trust: (1) 14401 S. San Pedro Street (sold by Edson's for $11,101,500 cash); (2) 14421 S. San Pedro Street (sold by Edson's for $9,136,500 cash); 312 E. Rosencrans Avenue (sold by Brause for $7,290,000 cash); and 332 E. Rosencrans Avenue (sold by Brause for $9,684,000 cash).[1]

  Edson's and Brause are notable entities in the criminal case because they also held ownership interest in Nygard's residential property in Marina del Rey, California, where much of

---

[1] A corporate organization chart obtained from the receiver controlling the Nygard Group entities in bankruptcy receivership shows that the parent company of both Brause and Edson's is Nygard Properties Ltd. and that 14702 South Maple Street LLC is a subsidiary of Edson's.

Page 2

the offense conduct occurred. Company emails as well as bank records show that prior to the Canadian bankruptcy, funds for the various entities in the Nygard Group, including the American entities, were intermingled. For example, bank records show that Edson's has provided funding to Nygard International Partnership, a Canadian entity which operated Nygard's fashion business. Company emails also demonstrate that Nygard personally controlled the various entities in the Nygard Group whether or not he was formally the managing executive. Nygard's Company emails show, for instance, that Nygard controlled Edson's and directed that money be moved between Edson's accounts and others. In or about March 2020, days after the Company announced it was seeking bankruptcy protection, Company emails and attached wire transfer records show that Nygard, Fenske, and Dyborn initiated multiple large-scale transfers between Nygard Group entities, including Nygard International Partnership, Edson's, and Topanga, another American Nygard group entity.

Very Truly Yours,

AUDREY STRAUSS
Acting United States Attorney

By: _____
Celia V. Cohen
Jacqueline C. Kelly
Allison C. Nichols
Assistant United States Attorneys
(212) 637-2466 / 2456 / 2366

# EXHIBIT C



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 5, 2021

**BY EMAIL**

Jean Aylward
Office of Internal Affairs
United States Department of Justice
Criminal Division
1301 New York Avenue, N.W.
Washington, D.C. 20530

     **RE:**    *United States v. Peter Nygard*, 20 Cr. 624 (S.D.N.Y.)

Dear Ms. Aylward:

      We write to provide additional information regarding Peter Nygard, the defendant in the above-referenced case. Nygard was provisionally arrested on December 14, 2020. The full extradition package will be submitted to Canada by February 12, 2021.

      Nygard is the leader and founder of an international clothing design, manufacturing, and supply business headquartered in Winnipeg, Canada, with major offices and warehouses in the United States, including New York City and California. Nygard operated, and continues to operate, a constellation of corporate entities organized in various countries (the "Nygard Group" or the "Company"). Over at least the last twenty-five years, Nygard used the Nygard Group's influence, as well as its employees, funds, and other resources, to recruit and maintain victims, including adult females and girls under the age of 18, for Nygard's sexual gratification and the sexual gratification of his friends and business associates. Nygard and his co-conspirators, including Nygard Group employees, used force, fraud, and coercion to cause women and minors to have sex with Nygard and others.

      Nygard should be detained because, as outlined below, he presents (1) a danger to the community and (2) a flight risk, and (3) the evidence against him is strong.

### Danger to the Community

      If released, Nygard's presents a danger to the community in light of the nature of his crimes and the likelihood that he will continue to engage in such conduct. As reported by multiple victims interviewed as part of this investigation, Nygard requires constant access to sexual partners and particularly to new sexual partners—willing or unwilling—a pattern that has remained consistent over multiple decades. Moreover, Nygard's course of conduct over at least the last 25 years demonstrates that he utilizes other people—including co-conspirators, other victims, family members, and employees of the Nygard Group, among others—to perpetuate,

support, and mask his criminal conduct. Nygard's demonstrated ability to engage in criminal conduct in concert with others renders him a particular danger to the community that could frustrate any bail conditions that might otherwise be set. Moreover, while much of Nygard's criminal conduct has occurred in the United States, over the last 25 years and with the assistance of employees of the Nygard Group, Nygard has also enticed women to travel to Canada for this purpose and victimized them at properties in Winnipeg, Toronto, and Falcon Lake. Some of the employees and confidantes who have facilitated such conduct continue to work for and to assist Nygard.

Harm to Nygard's victims has included not only economic and psychological harm but also numerous instances of non-consensual sex, including non-consensual group sex, attempted forcible rapes, and drugging of victims. The investigation, including interviews with more than a dozen victims and review of phone, email, and social media evidence, shows that Nygard's criminal conduct has affected hundreds of victims. While some victims have suffered only a single sexual assault by Nygard, others have been subjected to persistent manipulation and sexual abuse. These longer-term victims are required to be constantly available to Nygard and are not permitted to leave his property without his permission.

As recently as February 2020, Nygard travelled into Canada with a female U.S. citizen, ostensibly working as his personal assistant ("Female-1"). Female-1 was with Nygard until approximately October 2020, when she returned to the United States. Upon her return to the United States, the FBI executed a search warrant for Female-1's cellphone. Communications on Female-1's cellphone indicate that, while in Canada, she was required to reside with Nygard; that she was worked by Nygard to the point of exhaustion; that Nygard closely monitored her movements; and that Nygard explicitly instructed her that she was not permitted to leave the premises without his permission. In the days leading up to Female-1's departure, she communicated with Victim-6, telling her, in sum and substance, that Nygard had "been a monster" and that she was planning to leave. After being in Canada with Nygard for approximately eight months, Female-1 decided to try to leave after Victim-6 encouraged her to do so, but Female-1 was only able to leave when another person within the United States with knowledge of her circumstances and whereabouts purchased a plane ticket for Female-1. This recent conduct, together with Nygard's decades-long course of conduct, demonstrates that Nygard presents a persistent danger to the community.

Moreover, during the past several decades, Nygard has repeatedly engaged in efforts to obstruct justice and tamper with potential witnesses against him. These efforts have included paying witnesses to provide information that Nygard knew to be false, monitoring contact between victims and U.S. law enforcement, and providing false information to witnesses, including those Nygard knew had been contacted by U.S. law enforcement. For instance, in or about 2016, after learning about a federal criminal investigation in the United States into trafficking activity, Nygard directed Victim-6 to provide testimony establishing that Minor Victim-1 was an adult under U.S. law, that is, over age 18, when she travelled with Nygard. Victim-6, who believed at the time that Minor Victim-1 was 18 or older, agreed, and offered sworn statements at what she understood to be a civil deposition. After Nygard subsequently rewarded her with a $2,000 cash bonus, she began to doubt the veracity of her statements and later learned that Minor Victim-1 had been under age 18. Messages recovered from Nygard's

phone demonstrate that in or about December of 2019, a witness who had been lawfully served by the FBI with a subpoena ("Female-2") sent Nygard a photograph of the FBI agent's business card. Nygard indicated he would make inquiries about the agent and about 20 days later, he sent Female-2 another message falsely telling her that the agent was a "fake." Victim-3 has also spoken to another longtime "girlfriend" ("Female-3") who told Victim-3 that in the summer of 2020, after the U.S. investigation had been revealed, Nygard contacted Female-3 from another person's phone to convey, in substance, that if she were not on his "side" then she was "going down." These efforts threaten not only the prosecution of Nygard, but the ongoing investigation of his co-conspirators.

### Flight Risk

Nygard presents a substantial risk of flight. He faces mandatory minimum terms of imprisonment of 10-years and 15-years and a maximum sentence of life imprisonment.

Furthermore, Nygard enjoys vast resources that would allow him to flee Canada, and he has a history of obscuring his wealth through various legal structures and by placing property and entities in the name of family members and other loyalists while retaining control over them. As such, Nygard's net worth and the wealth he has access to are difficult to estimate precisely, but suffice it to say that the sums are vast. For instance, public records indicate that a warehouse owned by one of the corporate entities within the Nygard Group controlled by Nygard was sold in or about August of 2020 for more than $30 million USD. Banking records and emails obtained through U.S. legal process establish that, regardless of their formal ownership or management structure, many if not all of the entities within the Nygard Group are in fact operated by Nygard and that Nygard controls their finances. Documentary evidence further demonstrates that Nygard and the corporate entities that he controls maintain numerous bank accounts in multiple countries. Nygard and these corporate entities also maintain real property in Canada, the United States, and the Bahamas. Nygard is a citizen of both Canada and Finland. While we are not aware whether he has a valid Finnish passport, border crossing records reflect that he once had a Bahamian identity documents, as well.

Although certain of Nygard's U.S. and Canadian entities were forced into bankruptcy by a major lender in February 2020, Nygard has maintained control over other corporate entities with significant assets. Further, while bankruptcy proceedings have temporarily slowed Nygard's ability to liquidate certain assets, he has maintained control over significant real property and bank accounts held by non-bankruptcy entities. Public real estate records, as well as filings in the Canadian bankruptcy proceeding, demonstrate that Nygard has recently been liquidating some of these assets, including some in the United States, and using Company employees to extract cash for his use. Emails as well as public filings in the Nygard bankruptcy proceeding show that Company employee and proposed surety Greg Fenske was involved in transferring large sums of money (numerous transactions over $200,000) between companies in the Nygard Group when the bankruptcy—triggered in part by allegations of Nygard's sex crimes—was imminent. The bankruptcy filings also show that Fenske and other employees, including close associate Tiina Tulikorpi, also took sizeable cash advances from their corporate credit cards in or about late February and early March 2020. Fenske and Nygard also authorized the purchase of nearly $15,000 in pre-paid cash cards using corporate credit cards,

and Fenske separately increased the spending limits on a number of corporate credit cards during that same period. Similarly, Angela Dyborn, a longtime Company employee based in the United States and Nygard's niece, was involved in executing large transfers of assets between companies in the Nygard Group. These employees continue to work with and for Nygard. Moreover, the bankruptcy receivership is expected to end in early 2021, and Nygard will then have even easier access to additional corporate assets.

For these reasons, Nygard has a significant incentive and means to flee. Indeed, communications on Female-1's phone indicate that at least as recently as April 2020, Nygard was considering travel to Malta or Bermuda, and that in or about June 2020, he was considering the logistics of travelling under an alias. The fact that Female-1 undertook such research about traveling under an alias on Nygard's behalf is consistent with evidence provided by multiple victims and confirmed by Nygard's email that Nygard does not undertake travel and other logistical arrangements personally, but delegates them to his staff, indicating that, in Female-1's absence, Nygard would be inclined to turn to other employees for administrative tasks that could include arrangements to flee.

Finally, Nygard has a recent history of failure to appear in legal proceedings. As publicly reported, a warrant was issued for his arrest in the Bahamas in January 2019 after he failed to appear for sentencing related to two contempt of court convictions stemming from orders imposed in a civil action.[1] Nygard was ultimately fined and sentenced to 90 days in prison as a result of those convictions.[2] Emails and phone records reflect Nygard's awareness of these legal proceedings; nonetheless, he has not returned to the Bahamas as directed. To the contrary, Nygard took steps to feign an inability to travel as a result of medical problems. In a statement to American authorities, Victim-6 stated that Nygard directed her to help him produce false evidence of a serious medical condition in early 2019. Nygard directed Victim-6, for instance, to photograph him at a hospital and in a wheelchair, and Victim-6 accompanied Nygard to various appointments in Canada in which Nygard requested documentation of medical issues. During this time, Victim-6 did not observe Nygard to be suffering from any significant health issues. According to Victim-6, Nygard also obtained various letters from supposed medical professionals in Canada to support that he was unable to travel. These letters included one dated February 9, 2019 from Dr. Harvey Lee, the same physician that Nygard relies on in his bail application to argue that he is medically unfit for confinement. Victim-6 provided a copy of the letter to the American authorities. In his letter addressed to "whom it may concern," Lee indicated that Nygard had been "under close monitoring and surveillance" and continued to have unspecified "problematic symptoms," and also noted that Nygard would be travelling with a "personal assistant who has been apprised of careful safety instructions for travel." Victim-6 also provided the American authorities with a video recording of a conversation between Lee and Nygard during which Victim-6 was present. In the recording, which is approximately one minute and five seconds in length, Nygard thanks Lee, saying it's "so kind in doing all this kind of stuff" and Nygard and Lee discuss what the appropriate amount for an invoice. Nygard requests a higher invoice because it's "better for the record," stating that "something for $200, it

---

[1] *See generally* https://nationalpost.com/news/world/court-in-bahamas-issues-arrest-warrant-for-canadian-fashion-mogul-peter-nygard.

[2] *See generally* https://www.cbc.ca/news/canada/manitoba/peter-nygard-sentenced-jail-bahamas-1.5365500

doesn't look good." Lee agrees to send an invoice for "probably a thousand dollars," and Nygard replies in sum and substance, "make sure you got three zeros instead of two." In her statement, Victim-6, the referenced "personal assistant" in Dr. Lee's February 2019 letter, told American authorities that she understood from Nygard that he was undertaking these efforts to avoid travelling to the Bahamas, and that based on her daily observations of Nygard, she did not believe him to require any special assistance to travel. Indeed, Nygard continued to travel over the next year – just not to the Bahamas – including to various locations in the United States including New York and Los Angeles.

### Strength of the Evidence

As part of the investigation,[3] numerous victims were interviewed, including Minor Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6. With the exception of Victim-4 who did not have a long-term relationship with Nygard, each of these victims described a relationship with Nygard in which they were paid for sex that was in turn induced through force, fraud, and coercion. Victim-4 was transported in a Company vehicle from New Jersey to New York, where Nygard attempted to force Victim-4 to engage in sexual conduct, including by digitally penetrating her without her consent. Likewise, each of the other victims described herein have recounted instances where Nygard forced or compelled them to have sex with him or others against their will. For instance, Nygard took each of those victims to sex clubs, where he either gave other men permission to perform sexual acts on the victims without their consent or used a combination of threats and psychological pressure to compel them to have sexual contact with other men under circumstances in which they did not feel free to say no. Nygard at times had sex with Victim-2, Victim-3, and Victim-5 while they were sleeping, or they awoke to him roughly turning them over and beginning to have sex with them without their prior consent. Victim-3 was drugged and gang raped while traveling with Nygard outside of her home country. Although Victim-3 recalled few details of the assault, the next morning Nygard complained that she had "ruined" the night by screaming and kicking.

These victims not only corroborate one another, but they are also corroborated by other evidence in the case, including emails from Nygard's corporate email account, corporate records maintained by the Nygard Group, messages from Nygard's cellphone and the cellphones of certain victims, and social media posts, all of which was obtained by U.S. legal process. Some of this evidence is described in the preceding sections, and some of this evidence is further discussed below.

As an initial matter, Nygard's contact with Minor Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6 and his use of Company resources to recruit and keep these victims close to him are corroborated by Nygard's email, messages and/or contacts from Nygard's cellphone, corporate records, messages from the cellphones of certain victims, and social media posts. These same types of evidence also corroborate the sexual and coercive nature of Nygard's relationships with Minor Victim-1, Victim-2, Victim-3, Victim-5, and Victim-6.

---

[3] The U.S. criminal investigation is entirely separate from various civil lawsuits that are pending in the United States.

In addition, there are numerous emails between Nygard and Company employees regarding the organization of Pamper Parties, one of the main tools that Nygard used to recruit new victims. These emails include guidelines for who could be invited and how guests should be "ranked" to determine who would be invited to future events. For instance, in a 2002 email to Bahamas-based employees, Nygard clarified the guidelines, writing: "before allowing them to so bring - only desirable BEAUTIFUL SIZE 8 OR LESS CAN BE ACCEPTABLE." A rating system was also used to invite guests to parties in the United States. For example, in 2005, a California-based employee sent Nygard photos of potential party invitees, and Nygard responded with ratings for the women, writing: "I RATED most in CATEGORY - you can then COMMAND all AA LIST & send email invitation to them for this WEEKEND PARTY."

In addition, corporate records maintained by the Nygard Group include Pamper Party guest lists, including notations regarding guests' physical appearance (for example, a notation that a guest was turned away because her friends "were not pjn approved" and were "fat") and whether or not guests stayed overnight with Nygard at his California property, as well as a template Pamper Party invite, which reminds guests that only women who are "attractive and physically fit" are invited and that they must be pre-approved based on a photo sent ahead of the event.

Nygard's recruitment of victims is also corroborated by messages from his cellphone. For example, in May 2019, Nygard exchanged messages with an employee in California in which they discussed recruiting events at his California property, including poker games and Pamper Parties, and the employee sent Nygard photos of prospective female guests. At one point in the conversation, the employee informed Nygard that "the girl who's upstairs with you" needed a ride home and asked Nygard if he would approve payment for an Uber, which he did. Similarly, in messages from Nygard's cellphone exchanged with an employee in the Bahamas, the employee asked Nygard if we wanted a "guest," to which he replied: "yes, that would hit the spot."

The evidence against Nygard also includes numerous emails between Nygard and individuals who recruited victims for him. For example, there are emails from 2008 and 2009 between Nygard and a Los Angeles-based madam, in which the madam sends Nygard photos of women for his approval. In one email from July 2008, Nygard asked the madam: "[did I] DO her"? Other emails confirm that Nygard has had sexual contact with several of the madam's "clients" and that the madam provided her bank account information to Nygard in order to receive payment. In addition, there are emails from 2008 through 2013 between Nygard and a modeling agent who funneled women and girls to Nygard under the pretense of modeling jobs.

### Nygard's Bail Application

In connection with his application for bail, Nygard relies on affidavits from Dr. Harvey Lee, Jose Mari Vasquez, Greg Fenske, Robert MacKenzie, Steven Mager, and David Lu. Fenske and Mager also propose to be a surety for Nygard's application. As described above, Nygard has relied on Dr. Lee in the past in connection with his efforts to evade his required appearance in court in the Bahamas. Lee notes in his affidavit that Nygard became a patient in January 2019, meaning that he had no preexisting doctor-patient relationship with Nygard before Nygard began

attempting to obtain evidence of medical problems to avoid travel to the Bahamas where he faced criminal contempt charges.

Two of the other affidavits offered by Nygard were supplied from individuals – Vasquez and Fenske – with connections to the criminal conduct. Vasquez's affidavit falsely states, for instance, that he never saw or heard of any "untoward conduct towards women." However, numerous victims, including Victim-2, Victim-3, and Victim-6, have described Vasquez's longtime role working for Nygard, which included functioning as his driver and security in Winnipeg. In that role, Vasquez controlled access to Nygard's apartment at Nygard's sole direction, meaning that Vasquez did not permit anyone – including the victims – to enter or exit the premises without Nygard's express permission. Although Vasquez's affidavit describes how a particular female employee with Nygard in Canada in 2020 was free to come and go "as she pleased," that account is inconsistent with the evidence, including the statements of Victim-2, Victim-3, and Victim-6. Vasquez also drove victims and Nygard to a local swing club. Messages from Female-1's cellphone corroborate that: after Female-1 told Vasquez that Nygard had requested to go to the "club" and Vasquez instructed Female-1 to ask Victim-3, who was no longer employed by Nygard, the details of the club. Victim-3 and Victim-2 have both reported that Nygard brought them to a swing club in Winnipeg.

As described above, Fenske is also a long-term employee of Nygard's who was aware of Nygard's criminal conduct and facilitated it. For example, Nygard's Company email shows, amongst other things, that Fenske was involved in paying certain "girlfriends" through Company funds; that Fenske was involved in providing "in-kind" payments to "girlfriends," including dental work; and that Fenske was aware of Nygard's travel with "girlfriends" and use of Nygard Group funds for the same.  who was aware that Nygard was paying "girlfriends" with corporate funds and facilitated transactions at Nygard's direction. For example, in a 2017 email, Fenske and Nygard emailed about paying Victim-2 from both "private" and "corporate" payroll. In a 2019 email, Fenske emailed Nygard for his approval of payments for dental procedures for various women, including Female-1 and a California-based female employee who recruited other women for Pamper Parties. Emails also show that Fenske was aware that Company funds were being used in connection with Pamper Parties in the Bahamas and California. Fenske's personal involvement in facilitating the offense conduct through the use of Company funds, and his efforts in February 2020 to transfer funds from the Nygard Group entities now in receivership, demonstrate Fenske's ill-suitability as a surety for Nygard in this case.

In addition to Fenske, Nygard proposes Steve Mager as a surety. Email evidence confirms that Steve Mager was hired as a salaried construction director for the Company in April 2019 at $129,000 per year. In that capacity, Mager appeared to oversee projects like maintenance, improvements, and landscaping to Nygard's properties, maintenance of vehicles, and construction of retail locations, as well as supervise employees involved in the same. According to the bankruptcy receiver, the vast majority of Company employees were laid off after the Company went into receivership. Email evidence also shows that during the period of his employment with the Company, Nygard instructed Mager on several occasions to withhold overtime pay from Company employees. For example, in July of 2019 in denying overtime pay for multiple workers, Nygard advised Mager: "PATH TO SUCCESS: ALWAYS PUT IN MORE THAN YOU ARE PAid." In September 2019, an employee who appeared to report to

Mager emailed Nygard, with Mager copied, requesting approval for eight hours of overtime. Nygard denied the request, instructing Mager to instead "trade time" or recommend a bonus instead, and Mager agreed that he would "work it out" with the employee. This pattern suggests that Mager is willing to bend or break the law at Nygard's direction. In conjunction with his criminal record, which includes two serious narcotics convictions,

Finally, the affidavit provided by David Lu is similarly unreliable. Lu's assertion that poker games were not "occasions to attract women" is incredible on its face, as it is contradicted by overwhelming evidence, including statements provided by the victims discussed in this letter as well as documentary evidence. For example, in emails from November of 2019 between Nygard and an employee based in Marina Del Rey, the employee sent Nygard a dinner and poker guest list for his approval. Nygard demanded to see pictures of the "girls" who were coming, which the employee then sent via WhatsApp to his phone. Nygard then instructed the employee to bring one of the girls early before dinner.

Very Truly Yours,

AUDREY STRAUSS
Acting United States Attorney

By: _____

Celia V. Cohen
Jacqueline C. Kelly
Allison C. Nichols
Assistant United States Attorneys
(212) 637-2466 / 2456 / 2366

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2021, I served the following documents via electronic mail upon all attorneys of record:

- The Letter Motion to Seal;

- The Notice of Non-Party DGM Financial Group's Motion to Clarify Scope of Restraining Order to Exclude Untainted Funds;

- The Memorandum of Law in Support of Non-Party DGM Financial Group's Motion to Clarify Scope of Restraining Order to Exclude Untainted Funds; and

- The Declaration of Alexandria E. Swette in Support of Non-Party DGM Financial Group's Motion to Clarify Scope of Restraining Order to Exclude Untainted Funds, including the exhibits attached thereto.

Alexandria E. Swette